UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FC INVESTMENT GROUP LC, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 05-1753 (RMC) |
| LARRY B. LICHTENSTEIN, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OPINION**

Plaintiffs Lawrence J. Eisenberg and his investment firm, FC Investment Group LC, bring this action against Defendants Larry B. Lichtenstein and his law firm, Larry B. Lichtenstein and Associates, to recover more than $5 million dollars they invested in a foreign currency trading scheme operated by Titan Global Strategies Ltd. ("Titan") — a now-defunct, third-party corporation in which Mr. Lichtenstein served as director. Arguing that Titan was a sham that placed no investments and existed only to shield its directors from personal liability, Plaintiffs seek to pierce Titan's corporate veil and hold Mr. Lichtenstein accountable for fraud, civil conspiracy, civil aiding and abetting, and negligent misrepresentation.

Defendants have filed a motion to dismiss Plaintiffs' Amended Complaint for lack of personal jurisdiction or, in the alternative, to transfer venue to the Northern District of Illinois ("Defs.' Mot.") [Dkt. #11]. For the reasons explained below, Defendants' motion will be denied, and this matter will be set for a scheduling conference.

## I.  FACTUAL BACKGROUND

The facts are taken from the allegations in the Amended Complaint.  This dispute dates back to September 1998, when Titan employees allegedly contacted Mr. Eisenberg in his District of Columbia office about investing in a foreign currency trading account to be managed by Titan.  Am. Compl. ¶ 8.  At that time, Mr. Eisenberg was told that Milan Martinic owned and controlled Titan.  *Id.*  Mr. Eisenberg initially invested $10,000 with Titan and, by October 2003, he had personally invested more than $1 million.  *Id.* ¶¶ 9-10.  In April 2001, Mr. Eisenberg created FC Investment Group LC ("FCIG"), a Maryland limited liability company, to assist his friends and family members in making their own foreign currency investments with Titan.  *Id.* ¶¶ 1, 12.  It is alleged that by October 2003, Mr. Eisenberg, together with his friends and family members, had used FCIG to invest approximately $5 million with Titan.  *Id.* ¶ 13.

Titan and its employees allegedly reassured Mr. Eisenberg that his investments through FCIG were legitimate and secure.  In early 2001, Titan assigned one of its employees, Charles Knott, to be FCIG's "advisor and point-of-contact" for Titan.  *Id.* ¶ 15.  Mr. Knott apparently met with Mr. Eisenberg in his D.C. office several times in 2001 and 2002 to explain Titan's operations.  *Id.* ¶¶ 15-16.  He also showed Mr. Eisenberg a PowerPoint presentation that detailed the scope of Titan's alleged relationship with a currency trader, IFX Markets Ltd. ("IFX"); IFX purportedly performed certain management, investment, and brokerage services on Titan's behalf.  *Id.* ¶¶ 16, 20.  Titan sent monthly account statements to Mr. Eisenberg that showed significant returns on his investments.  *Id.* ¶ 14; Eisenberg Aff. ¶ 5.

It is also alleged that Mr. Lichtenstein was another source of reassurance.  Mr. Lichtenstein was Mr. Martinic's friend, business partner, and personal attorney, *id.* ¶ 22, and a

principal in the law firm Larry B. Lichtenstein & Associates. *Id.* ¶ 4; Lichtenstein Decl. ¶ 2. The Amended Complaint alleges that in 2002, Mr. Lichtenstein began relaying information about Titan to Mr. Eisenberg. Am. Compl. ¶¶ 23-25. On at least four occasions in 2002, Messrs. Lichtenstein and Eisenberg allegedly spoke via telephone about a variety of compliance issues. *Id.* ¶ 26. On some of these occasions, Mr. Lichtenstein allegedly initiated the calls by phoning Mr. Eisenberg at his D.C. office. *Id.*

On November 12, 2002, Mr. Lichtenstein registered Titan as an Illinois corporation, with Mr. Martinic and Mr. Lichtenstein as its two directors and with $1,000 in initial capital. *Id.* ¶¶ 28-29. Mr. Eisenberg and the other FCIG investors continued to invest with Titan, to the tune of $2 million in November 2002 alone. *See id.* ¶¶ 30, 32. It was not until late 2003, when Titan rebuffed his request to close FCIG's account, that Mr. Eisenberg discovered that the Titan/IFX venture was a fraud. *Id.* ¶ 34.

The Amended Complaint recounts Mr. Eisenberg's efforts to recover FCIG's investments with Titan. During late 2003, he spoke with Mr. Lichtenstein via telephone on at least six different occasions to discuss return of the funds. *Id.* ¶ 37. Again, on some of these occasions, it was Mr. Lichtenstein who phoned Mr. Eisenberg at his D.C. office, rather than the reverse. *Id.* During these calls, Mr. Lichtenstein allegedly led Mr. Eisenberg to believe that a refund was forthcoming, at one point essentially stating that a $6 million certified check was "in the mail." *See id.* ¶ 38. On January 14, 2004, Mr. Lichtenstein allegedly faxed Mr. Eisenberg a deposit slip indicating that $4.3 million had been deposited in a Titan-controlled bank account, suggesting that Titan had funds to repay FCIG. Mr. Eisenberg asserts that he was thus induced to refrain from taking legal action. *Id.* ¶ 39.

3

According to the Amended Complaint, this strategy was successful until Mr. Eisenberg discovered that the deposit slip was counterfeit and that Titan had placed no investments whatsoever on FCIG's behalf. *Id.* ¶¶ 7, 11, 40. In March 2004, Mr. Eisenberg brought suit against Titan and Mr. Martinic in a Wisconsin state court and, in July 2004, obtained a $6.5 million judgment against them. *Id.* That judgment remains unsatisfied.

In a renewed effort to recover their investments, on September 1, 2005, Mr. Eisenberg and FCIG filed this action against Mr. Lichtenstein and his law firm, seeking to pierce Titan's corporate veil and hold Mr. Lichtenstein liable for fraud, civil conspiracy, civil aiding and abetting, and negligent misrepresentation. *Id.* ¶ 7.

## II. DISCUSSION

Defendants' motion to dismiss or, in the alternative, transfer venue, raises three questions: (1) whether this Court has personal jurisdiction over Defendants; (2) whether venue is properly laid in this district; and (3) whether, if venue is proper here, transfer is nonetheless warranted. As explained below, the Court finds that has personal jurisdiction over Defendants, venue is proper in this District, and transfer is not warranted.

### A. This Court Has Personal Jurisdiction Over Defendants

Plaintiffs assert that the Court's exercise of personal jurisdiction over Defendants is proper under subsection (a)(1) of the District of Columbia long-arm statute, D.C. Code § 13-423.[1] That subsection provides that the Court "may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's transacting any business in

---

[1] Plaintiffs also assert that personal jurisdiction is proper under D.C. Code § 13-423(a)(3). Because the Court finds that jurisdiction is proper under subsection (a)(1), it is not necessary to address this question.

the District of Columbia." D.C. Code § 13-423(a)(1); *see Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987) (noting that a federal district court's jurisdiction is coextensive with that of a D.C. court). "This provision is given an expansive interpretation that is coextensive with the due process clause." *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004) (internal quotation marks omitted). Thus, "the statutory and constitutional jurisdictional questions, which are usually distinct, merge into a single inquiry." *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995). The question, then, is whether Defendants "purposefully established 'minimum contacts with [the District of Columbia] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Helmer*, 393 F.3d at 205 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (alteration in original). Plaintiffs bear the burden of establishing a factual basis for the Court's exercise of personal jurisdiction over Defendants, *Crane v. N.Y. Zoological Soc.*, 894 F.2d 454, 456 (D.C. Cir. 1990), and where, as here, the Court rules on the basis of the pleadings and affidavits, without an evidentiary hearing, factual discrepancies are resolved in favor of the Plaintiffs, *Reuber v. United States*, 750 F.2d 1039, 1052 (D.C. Cir. 1984).

Defendants argue that Mr. Lichtenstein's contacts with the District of Columbia — in essence, a series of telephone calls and a facsimile transmission — are an insubstantial basis for personal jurisdiction, especially given that the contacts arose in the context of Mr. Lichtenstein's professional representation of Titan and were often in response to Mr. Eisenberg's requests for information. The Court cannot agree.

"[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines . . . ." *Burger King Corp. v. Redzewicz*, 471 U.S. 462, 476 (1985). Accordingly, it has long been the law that an absence

of physical contacts will not defeat personal jurisdiction so long as the defendant's efforts are purposefully directed toward residents of another state. *Id.* Just as clearly, transactions by telephone and facsimile alone can, depending on the circumstances, be an adequate basis for personal jurisdiction. *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 511 n.4 (D.C. Cir. 2002).

Here, Plaintiffs allege that Messrs. Lichtenstein and Eisenberg spoke via telephone at least ten times in 2002 and 2003, and that Mr. Lichtenstein initiated many of those calls by phoning Mr. Eisenberg in his D.C. office, at a number with a 202 area code. Am. Compl. ¶¶ 26, 37; Eisenberg Aff. ¶ 4-5. Plaintiffs also allege that Mr. Lichtenstein sent a fax to Mr. Eisenberg in his D.C. office, at a number also bearing a 202 area code. Am. Compl. ¶ 39; Eisenberg Aff. ¶ 6. Thus, Mr. Lichtenstein knew he was dealing with an investor located in Washington, D.C.

More important than the number of these contacts, however, is their significance. *See Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001) ("It is the quality of the contacts, not the quantity, that determines whether they constitute 'purposeful availment.'"). These were not conversations by happenstance. Plaintiffs allege that Mr. Lichtenstein defrauded them by systematically communicating false information about Titan's corporate status, the relationship between Titan and IFX, the earnings on FCIG's phantom investments, and the return of FCIG's funds. These contacts were directed toward Mr. Eisenberg in the District of Columbia and had foreseeable effects here. *See id.* Viewed in the context of Plaintiffs' allegations, they are better described as deliberate rather than incidental. Defendants should have reasonably anticipated having to litigate a matter arising directly from those contacts in this jurisdiction.[2]

---

[2] Although Defendants argue that the "minimum contacts" test is not satisfied, they do not argue that this Court's exercise of personal jurisdiction offends "traditional notions of fair play and substantial justice." *See Burger King*, 471 U.S. at 476-77; *Helmer*, 393 F.3d at 205. Further, the

To resist this conclusion, Defendants rely almost exclusively on *Bank of Cape Verde v. Bronson*, 869 F. Supp. 21 (D.D.C. 1994), which, although bearing some superficial similarity to this case, does not change the analysis here.[3] In *Bank of Cape Verde*, a third party borrower, after defaulting on its loans from the plaintiff bank, went bankrupt, leaving the bank's judgment against it unrecoverable. *Bank of Cape Verde*, 869 F. Supp. at 22. The bank then sued the borrower's attorney who, as required by the loan agreement, had furnished an opinion letter confirming that the borrower was not insolvent. *Id.* The bank claimed personal jurisdiction based on the attorney's forwarding of opinion letters to the District of Columbia and making several phone calls to the Cape Verde Embassy in the District. *Id.* at 23. The court concluded that these contacts were insufficient, emphasizing that the attorney did not represent the bank, did not benefit directly from the loan agreement between the bank and borrowers, and any telephone calls or mailings occurred solely at the bank's request. *Id.*

Here, unlike in *Bank of Cape Verde*, whether Mr. Lichtenstein's contacts with Mr. Eisenberg in his D.C. office were wholly responsive to Mr. Eisenberg's inquiries or partly self-

---

Court concludes that it does not. There is no reason to believe that requiring these out-of-state Defendants to defend themselves here would impose a greater burden in this particular case than in the typical one. The District's interest in adjudicating these claims, although they were brought by a Maryland resident, remains strong, given that FCIG operated from an office in the District of Columbia. Adjudicating this dispute in the District is efficient and interferes with no fundamental substantive social policy. *See Burger King*, 471 U.S. at 477 ("[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.").

[3] In any event, "one district court decision is not binding on another district court." *Am. Council of the Blind v. Wash. Metro. Area Transit Auth.*, 133 F. Supp. 2d 66, 74 n.2 (D.D.C. 2001); *see In re Executive Office of the President*, 215 F.3d 20, 24 (D.C. Cir. 2000) ("District Court decisions do not establish the law of the circuit, nor, indeed, do they even establish the law of the district.") (citations and internal quotation marks omitted).

initiated is a matter of dispute. *Compare* Pls.' Opp'n at 9 *and* Am. Compl. ¶¶ 26, 37 *with* Defs.' Reply at 7-8. Viewing this factual discrepancy in the Plaintiffs' favor, as required by *Reuber*, 750 F.2d at 1052, at least some of these calls must be viewed as having been initiated by Mr. Lichtenstein. Moreover, Plaintiffs allege that Mr. Lichtenstein, as part of the scheme to defraud Plaintiffs, faxed Mr. Eisenberg a counterfeit deposit slip. That act, even if it occurred in response to an inquiry from Mr. Eisenberg, is hardly, as Defendants' argue, a "gesture of accommodation," Defs.' Mot. at 9; rather, it constitutes an affirmative misrepresentation directed to a foreseeable victim in the District, *cf. Neal*, 270 F.3d at 332, that goes beyond the type of "unilateral activity" on the part of a plaintiff that has been found insufficient to confer personal jurisdiction, *see, e.g.*, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984).

Moreover, unlike *Bank of Cape Verde*, Mr. Lichtenstein may have benefitted personally from the alleged frauds. Nothing in *Bank of Cape Verde* suggests that the defendant attorney was anything but completely independent from the third-party borrower. Here, by contrast, it is undisputed that Mr. Lichtenstein, though apparently acting as counsel for Titan, was also one of Titan's two directors. This raises the inference that Mr. Lichtenstein directly benefitted from the alleged fraudulent investment scheme that bilked Mr. Eisenberg and other FCIG investors out of some $5 million. This factual discrepancy also must be resolved in Plaintiffs' favor at this point in the litigation. *See Reuber*, 750 F.2d at 1052. Thus, *Bank of Cape Verde* is simply inapposite.[4]

---

[4] Defendants' reliance on *Chung v. NANA Dev. Corp.*, 783 F.2d 1124, 1129 (4th Cir. 1986), and *United States v. Ferrara*, 54 F.3d 825, 831 (D.C. Cir. 1995), is likewise misplaced. The *Chung* defendant's single contact with the forum was a shipment of goods purchased outside the forum; although the plaintiff originally was bound to take delivery outside the forum, the defendant later agreed to ship the goods into the forum merely as a "convenience" to the plaintiff. *Chung*, 783 F.2d at 1125-26, 1128. In *Ferrara*, the court rejected the plaintiff's argument that the defendant's "single, responsive mailing" was a sufficiently meaningful contact for due process purposes. *Ferrara*, 54

In the minimum contacts analysis, there are no "clear-cut jurisdictional rules" or "talismanic jurisdictional formulas." *Burger King*, 471 U.S. at 486 & n.29. But giving due regard to all the alleged facts and circumstances of this case, the parties' interactions and course of dealing, and the quality and nature of Mr. Lichtenstein's contacts with the District of Columbia, the Court concludes that its exercise of personal jurisdiction over Defendants comports with due process and with subsection (a)(1) of the D.C. long-arm statute.[5]

### B. Venue Is Proper in the District of Columbia

Defendants next argue that venue is inappropriate here because "the alleged wrongful acts occurred entirely outside of the District of Columbia" and the case has only a "minimal nexus" to the District. To prevail on a motion to dismiss for improper venue, a defendant must present facts that will defeat the plaintiff's assertion of venue. *2215 Fifth St. Assocs. v. U-Haul Int'l Inc.*, 148 F. Supp. 2d 50, 54 (D.D.C. 2001) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1352 (2d ed. 1987)). If venue is improper, the Court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

The relevant venue statute, 28 U.S.C. § 1391(a), formerly provided that an action based on diversity of citizenship, like this one, may be brought in the district "in which the claim

---

F.3d at 831 (citing *Envtl. Research Int'l Inc. v. Lockwood Greene Eng'rs Inc.*, 355 A.2d 808, 813 (D.C. 1976)). As discussed in the text, Mr. Lichtenstein's contacts with the District were not only more numerous than in *Chung* and *Ferrara*, but were also, according to Plaintiffs' allegations, calculated to defraud D.C. victims.

[5] In view of this conclusion, it is unnecessary to address Plaintiffs' additional argument for jurisdiction over Defendants under the theory of conspiracy jurisdiction. *See Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 78-80 (D.D.C. 2004) (explaining standard).

arose." 28 U.S.C. § 1391(a) (1988). It was amended in 1990 "to make venue proper in any 'judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.'" *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004) (quoting the Judicial Improvements Act of 1990, Pub. L. No. 101-650, § 311(1), 104 Stat. 5089, 5114) (1990). "Under the amended statute it is now absolutely clear that there can be more than one district in which a substantial part of the events giving rise to the claim occurred." Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3806 (1994 Supp.). Thus, it is no longer appropriate to ask which district is the "best" venue, *Setco Enters. v. Robbins*, 19 F.3d 1278, 1281 (8th Cir. 1994), or which venue has the most significant connection to the claim, *Weinberger v. Tucker*, 391 F. Supp. 2d 241, 244 (D.D.C. 2005). The proper question is "whether the district the plaintiff chose had a substantial connection to the claim, whether or not other forums had greater contacts." *Setco Enters.*, 19 F.3d at 1281.

In determining "whether the events or omissions are sufficiently substantial to support venue under the amended statute, a court should not focus only on those matters that are in dispute or that directly led to the filing of the action. Rather, it should review 'the entire sequence of events underlying the claim.'" *Mitrano*, 377 F.3d at 405 (quoting *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 (1st Cir. 2001)). Section 1391(a)(2) "may be satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action." *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 153-54 (2d Cir. 2001).

This case satisfies the requirements of § 1391(a)(2). Defendants argue that venue is not proper in this forum because the major events and collaborations leading to the alleged fraud occurred outside the District of Columbia. Plaintiffs allege that Defendants helped carry out a

fraudulent foreign currency investment scheme, Am. Compl. ¶ 7, that "bilked FCIG out of millions of dollars," *id*. ¶ 1. Mr. Lichtenstein is alleged to have played a major role by inducing Plaintiffs' reliance, reassuring Plaintiffs that they would receive refunds for their investments, and sending Plaintiffs account statements and false information, all directed to FCIG's District of Columbia office. These communications have much more than a "minimal nexus" to Plaintiffs' claim.

Taken as true, Defendants' contention that the "nucleus of facts giving rise to the claim occurred in Illinois," Defs.' Mot. at 18, does not necessarily warrant the conclusion that venue is improper in the District of Columbia. Even if Illinois, the site of many of the actions leading to the alleged fraud, has a strong connection to the claim, it is now recognized that more than one forum can be an appropriate venue for a claim so long as § 1391(a)(2) is satisfied. *See Setco Enters.*, 19 F.3d at 1281. Therefore, it is entirely proper for this Court to hear Plaintiffs' claim so long as they bear a substantial connection to the District of Columbia. *See id.* Because the communications by Mr. Lichtenstein to Mr. Eisenberg in the District of Columbia were a significant part of the sequence of events underlying the claims, venue is proper here.[6]

### C. Transfer of Venue is Not Appropriate

Motions to change venue are governed by 28 U.S.C. § 1404(a), which provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any

---

[6] Defendants further argue that FCIG's principal place of business may be in Maryland, rather than in the District of Columbia, so that this forum cannot hear Plaintiffs' claim. Defs.' Reply at 11. Even if true, Mr. Lichtenstein's communications in furtherance of the alleged fraudulent investment scheme were directed to FCIG's District of Columbia office. Therefore, a "substantial part of the events giving rise to the claim occurred" in the District of Columbia. 28 U.S.C. § 1391(a)(2); *see Setco Enters.*, 19 F.3d at 1281 (finding venue proper in the Western District of Missouri under § 1391(a)(2) although none of the parties resided in Missouri and the fraudulent acts occurred in Texas and Oklahoma).

civil action to any other district or division where it might have been brought." The D.C. Circuit "'has said that it is perhaps impossible to develop any fixed general rules on when cases should be transferred.'" *SEC v. Savoy Indus. v. Zimmerman*, 587 F.2d 1149, 1154 (D.C. Cir. 1978) (quoting *Starnes v. McGuire*, 512 F.2d 918, 929 (D.C. Cir. 1974) (en banc)). "Thus, the proper technique to be employed is a factually analytical, case-by-case determination of convenience and fairness." *Id.* (citing *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)).

Section 1404(a) is rooted in the earlier doctrine of *forum non conveniens*.[7] *Id.* at 1154. Although courts have "more discretion to transfer under § 1404(a) than they ha[ve] to dismiss on grounds of *forum non conveniens*," *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 253 (1981), they are guided by similar factors in both contexts — namely, the private and public interests at stake. *See Savoy Indus.*, 587 F.2d at 1154. Accordingly, the defendant must make two showings to justify transfer. First, a defendant must establish that the plaintiff originally could have brought the action in the proposed transferee district.[8] *Van Dusen v. Barrack*, 376 U.S. at 622. Second, the defendant must demonstrate that considerations of convenience and the interest of justice weigh in favor of transfer to that court. *Trout Unlimited v. Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996). As this Court has explained,

> The private interest considerations include: (1) the plaintiffs' choice of forum, unless the balance of convenience is strongly in favor of the

---

[7] The Court construes Defendants' motion "to transfer this case to the . . . Northern District of Illinois on the basis of *forum non conveniens*," Defs.' Mot. at 1-2, as a motion to transfer venue pursuant to 28 U.S.C. § 1404(a).

[8] Plaintiffs do not contest Defendants' assertion that the Northern District of Illinois could constitute proper venue for this action under 28 U.S.C. § 1391(a)(1). Therefore, the Court finds that the Northern District of Illinois is a "district . . . where [the action] might have been brought." 28 U.S.C. § 1404(a).

> defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses . . . , but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof. The public interest considerations include: (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home.

*Thayer/Patricof Educ. Funding LLC v. Pryor Res.*, 196 F. Supp. 2d 21, 31-32 (D.D.C. 2002) (omission in original). The party seeking transfer generally bears the burden of demonstrating that the balance of convenience of the parties and witnesses and the interest of justice are in its favor, *id.* at 31; *see Savoy Indus.*, 587 F.2d at 1154 (describing the district court's denial of a motion to change venue as a ruling that the movant "had failed to shoulder his burden"), and the plaintiff's choice of forum is ordinarily afforded great deference, *Thayer/Patricof*, 196 F. Supp. 2d at 31.

### 1. Private Interest Factors

Defendants argue that because the bulk of the evidence concerning the claim is located in Illinois and because the major events leading to the alleged fraud occurred in Illinois, transfer of venue is warranted. However, the Court cannot find that the private interest factors in this case weigh in favor of disrupting Plaintiffs' choice of forum.

The District of Columbia is not a forum without meaningful ties to the controversy, as Defendants allege, but is the location into which Defendants deliberately reached to conduct business negotiations. Defendants' contention that litigating in the District would substantially injure Mr. Lichtenstein's private law practice is not enough to defeat Plaintiffs' venue selection. Mr. Lichtenstein will have sufficient notice of trial to postpone any business commitments or cases until he returns. In addition, Mr. Lichtenstein has not demonstrated any great hardship such as "inability

13

to travel, significant expense, or medical disability that would adversely affect his ability to litigate this case" in the District of Columbia. *Kotan v. Pizza Outlet, Inc.*, 400 F. Supp. 2d 44, 50 (D.D.C. 2005).

The Court cannot give significant weight to the fact that Plaintiffs previously were able to litigate the underlying suit in Wisconsin. A plaintiff's choice of forum may not be defeated merely because it can be shown that he previously was able to travel to a different forum to litigate. *See Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (noting that § 1404(a) "calls on the district court to weigh in the balance a number of case-specific factors"). Rather, in order to demonstrate that it is necessary to transfer venue, a defendant must make a substantial showing that transfer is necessary. *See Piper Aircraft*, 454 U.S. at 255 (1981) (stating that "there is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum"). Even if, as Defendants contend, many of the wrongful acts did occur outside of the District of Columbia, Defendants have not pointed to the existence of any factors that would cause them to experience extreme hardship in accessing evidence if venue were not transferred to the Northern District of Illinois. *See Piper Aircraft*, 454 U.S. at 258-59 (finding that because many crucial witnesses were located overseas and therefore beyond the reach of compulsory process, and because a large portion of the relevant evidence was located in Great Britain, private interest factors weighed in favor of transferring venue); *Thayer/Patricof*, 196 F. Supp. 2d at 36 (stating that "in the context of a motion for a transfer of forum, the location of documents, given modern technology, is less important in determining the convenience of the parties").

When analyzing the convenience of parties and witnesses, a defendant must show that witnesses would be unwilling to testify in the District of Columbia. *Thayer/Patricof*, 196 F. Supp. 2d at 32. Otherwise, it is assumed that the witnesses will voluntarily appear, *id.*, and mere inconvenience to the witnesses alone is not enough to warrant transfer, *id.* at 34. In addition, "to support its request for transfer under section 1404(a), a moving party must demonstrate . . . what a non-resident witness will testify to, the importance of the testimony to the issues in the case, and whether that witness is willing to travel to a foreign jurisdiction." *Id.* at 33. While Defendants contend that the key witnesses who will offer testimony live in or near Illinois, they neither set forth the specific topic about which these witnesses will testify nor assert that these witnesses would be unwilling to travel to the District of Columbia. *See id.* at 32.

### 2. Public Interest Factors

Defendants' arguments as to public interest considerations are similarly unpersuasive. Defendants argue that Illinois law will apply to this controversy, causing this factor to weigh in favor of transferring venue. Assuming that Illinois law will be applied in this case, Defendants have not demonstrated that this Court will have difficulty doing so. In fact, this Court has recently applied various Illinois laws without observable difficulty. *See, e.g.*, *Dunseth v. Eli Lilly & Co.*, 404 F. Supp. 2d 97 (D.D.C. 2005) (analyzing and applying Illinois tort law); *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119 (D.D.C. 2004) (applying Illinois contract law).

Next, as to the relative congestion of the two courts, a review of federal court management statistics indicates that, in 2004, civil cases filed in the Northern District of Illinois proceeded to disposition somewhat more quickly but that dockets in the District of Columbia were

less crowded. Federal Court Management Statistics, U.S. District Court Judicial Caseload Profiles, *at* http://www.uscourts.gov/cgi-bin/cmsd2004.pl (last visited June 28, 2006); *see Savoy Indus.*, 587 F.2d at 1156 ("[Although] congestion alone is not sufficient reason for transfer, . . . relative docket congestion and potential speed of resolution is an appropriate factor to be considered.") (citation omitted). Finally, although there is certainly an interest in "deciding local controversies at home," *Thayer/Patricof*, 196 F. Supp. 2d at 31-32, the Court does not agree that this case constitutes a controversy local to Illinois. Rather, Titan and Lichtenstein conducted business across state lines and spent years negotiating with FCIG, a business located in the District of Columbia.

In sum, Defendants have not met their burden of showing that the balance of convenience of the parties and witnesses and the interest of justice are in their favor. This case will not be transferred.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss or, in the alternative, to transfer venue [Dkt. # 11] will be denied. The Court will set a scheduling conference. An Order accompanies this Memorandum Opinion.

Date: July 21, 2006                                /s/
                                        ROSEMARY M. COLLYER
                                        United States District Judge